UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALFONSO MILLS,

          Petitioner,

v.                                          Case No. 07-CV-13283
                                          Honorable Victoria A. Roberts

MILLICENT WARREN,

          Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S
## PETITION FOR WRIT OF HABEAS CORPUS

      Petitioner, Alfonso Mills, a state inmate, currently incarcerated at the Thumb

Correctional Facility in Lapeer, Michigan, has filed a *pro se* "Petition for Writ of Habeas

Corpus" [dkt.#1], pursuant to 28 U.S.C. § 2254.  The Habeas Petition challenges Petitioner's

state convictions for six counts of first-degree criminal sexual conduct, MICH.COMP.LAWS

750.520b(1)(a), for the sexual abuse of two four-year-old twin girls.  Respondent argues that

Petitioner's claims do not state habeas claims upon which relief can be granted.  For the reasons

set forth below, the Court will deny Petitioner's petition.

I.

      This case arises as a result of incidents that occurred between November 1998, and May

1999, while Petitioner was living with his girlfriend, Sylvette Holinshead, and her twin

daughters, Christa and Christian, in Oak Park, Michigan.  It was alleged that Petitioner sexually

penetrated the two complainants, who were four-years-old at the time, vaginally, anally, and

orally.  Petitioner was not the twins' biological father.

According to the prosecution's theory, all of the sexual assaults with which Petitioner had been charged had occurred in Oak Park. It was also alleged that during the same time period, Petitioner was sexually assaulting his biological daughter, Alissa Kuhn, then fifteen-years old, who was also living with them in Oak Park.

Subsequently, Ms. Holinshead and the twins moved to Canton, Michigan. The prosecution also alleged that the sexual assaults of Christa and Christian continued while the family lived in Canton, from May 2000 until June 2002.

Prior to trial, the prosecutor filed a motion, seeking admission of evidence pursuant to M.R.E. 404(b), which included the allegations that had been previously made by Alissa, as well as allegations that Petitioner continued to sexually assault Christa and Christian, while they lived together in Canton. The record indicates that defense counsel did not contest the prosecution's motion concerning Petitioner's alleged abuse of the twins, because, as a matter of trial strategy, the defense wanted to bring out inconsistencies in their testimonies.

Rather, defense counsel's objection was focused mainly on the allegations made by Alissa. Defense counsel pointed out that in a separate jury-trial proceeding, Petitioner was acquitted of the charges that he had sexually abused Alissa. The trial court nonetheless held that the evidence was admissible at trial.

Ms. Holinshead was first to testify. She testified that Christa and Christian were born on December 6, 1994, and, although Petitioner was not their biological father, they still called him "daddy." (Trial Tr. vol. I, p. 60, Mar. 10, 2003.) Ms. Holinshead acknowledged that she had two children with Petitioner, one aged five months, and the other aged one-and-one-half-years old.

According to Ms. Holinshead's testimony, she and her daughters had lived with Petitioner and Alissa in Oak Park beginning in November 1998. It was her testimony that while she worked during the day, Petitioner would take care of the children after they got home from school, around 3:00 p.m. She testified that she arrived home from work around 7:00 p.m. During that time period, Petitioner worked nights.

According to Ms. Holinshead's testimony, Alissa made allegations against Petitioner in May 1999. She said she was not supportive of Alissa at the time. Rather, Alissa was placed in foster care. According to Ms. Holinshead, she testified that she kept her distance from Alissa; since May 1999, she said that she had only spoken to Alissa once.

Ms. Holinshead further testified that, in September 1999, she and her twin daughters then moved to Canton, Michigan. Petitioner moved in with them in May of 2000, after a one-year absence. Because Petitioner did not have a job at the time, Ms. Holinshead took the twins out of day care so that he could watch them.

It was Ms. Holinshead's testimony that when they lived in Oak Park, both of her twin daughters had complained to her, at different times, of stomachaches and sore bottoms. On June 16, 2002, she said that her mother, Christine Love, told her about the twins' allegations against Petitioner. Subsequently, Ms. Holinshead said that she and her mother took the twins to the hospital. Ms. Holinshead said that initially the twins did not want to tell the emergency-room nurse what had happened to them. However, eventually, they told the nurse about their "secrets with [Petitioner]." (Trial Tr. vol. I, pp. 77-78, Mar. 10, 2003.)

On cross-examination, Ms. Holinshead said she never saw any blood in her daughters' underwear and acknowledged that initially she did not think that the allegations were true.

Christa testified next. However, during her testimony, Christa had a difficult time remembering things and her testimony required much prodding from the prosecutor. The following took place.

Christa began her testimony by acknowledging that she lived with her mother, Petitioner, Alissa, and Christian, while she attended Immaculate Heart of Mary School in Wayne County. It was Christa's testimony that Petitioner touched her bottom and privates during that time. Christa testified that Petitioner put his penis in her bottom, and, after he did that, her bottom would bleed. According to Christa, the sexual abuse occurred while her mother was at work.

Christa also testified that Petitioner touched the area where she urinates with his fingers and put his penis in her mouth. She said that the "white stuff" went into her mouth and that it tasted "nasty." (Trial Tr. vol. I, pp. 115-117, Mar. 10, 2003.) Christa said that Petitioner pushed her head into his private part and it "choked her." According to Christa's testimony, Petitioner told her, "I swear if you tell, I'll kill you." (Trial Tr. vol. I, p. 118, Mar. 10, 2003.)

During the cross-examination of Christa, defense counsel attempted to confront her with her prior inconsistent statements. Because it was difficult for the prosecutor to get Christa to answer certain questions, and, because she did not understand or respond appropriately to defense counsel's questions, defense counsel questioned whether she was competent to testify. The prosecutor recognized that Christa had been declared competent at three other hearings and noted that if the trial court found that she was not competent at this time, then her prior testimony would be admissible–testimony from the preliminary examination and other proceedings.

The trial court determined, after listening to Christa testify, that she was indeed

incompetent to testify; she had a lack of understanding of what certain words meant and she had contradicted her testimony at least six times. The trial court also noted that Christa was unresponsive and was not answering questions. The trial court believed that Christa's testimony from the prior hearing would therefore be admissible.

Following, the trial court instructed the jury that it had found that Christa was unable to understand and communicate, and, because her comprehension was insufficient, it was disqualifying her as a witness. The trial court then went on to tell the jury that it was going to leave Christa's testimony intact but that it was going to supplement her testimony by reading testimony from the preliminary examination and other proceedings. The trial court told the jury that the balance of Christa's examination was going to be interrupted and that the prosecution was instructed to call its next witness, Christian.

Christian testified that Petitioner was her "daddy." (Trial Tr. vol. I, p. 146, Mar. 10, 2003.) According to Christian's testimony, when she was four-years-old, she lived in a house with Alissa. She testified that she was going to Immaculate Heart of Mary School at that time.

According to Christian's testimony, she said that when her mother went to work, Petitioner or Alissa would watch her. It was her testimony that it was at that time when Petitioner would put his private part in the area where she urinates. Christian further testified that Petitioner did that to her more than ten times. She also said that he put his penis in her mouth and her bottom. According to Christian, she tasted "whitish [stuff]" that came out of Petitioner's penis. (Trial Tr. vol. I, p. 152, Mar. 10, 2003.)

Christian testified that she saw blood on Petitioner's private part after it had been in her bottom. She said that while she lived in the Oak-Park house, she did not tell her mother about

the sexual assaults because she was scared. Christian also testified that when she was living in Canton, she saw Petitioner put his penis in Christa's mouth, while the three of them watched a pornographic video.

On cross-examination, Christian testified that she saw Petitioner put "lotion or grease" on his penis before he put it in her bottom or vagina. (Trial Tr. vol. I, p. 195, Mar. 10, 2003.) However, further questioning during cross-examination revealed that Christian did not remember her preliminary-examination testimony, which differed from her trial testimony.

At the conclusion of Christian's testimony, the trial court released the jury for the day. The trial court then directed its attention to the problem that arose during Christa's testimony. What followed were some significant decisions made by Petitioner.

Petitioner received, and rejected, a plea bargain–the terms of which he would receive a sentence of ten to thirty years imprisonment on all six counts of first-degree criminal sexual conduct. Those sentences would run concurrent to each other and concurrent with two similar sentences that he was serving pursuant to a guilty-plea conviction for two counts of first-degree criminal sexual conduct, which stemmed from the allegations related to the incidents that occurred in Canton. That sentence was a minimum sentence below the low end of the applicable sentencing guidelines' range.

At that time, Petitioner also instructed his attorney not to move for a mistrial on the basis that Christian had testified that someone had told her what to say during trial. Petitioner told defense counsel that he wanted the trial to move forward. Defense counsel informed the trial court that Petitioner's decision was being made against his advice.

Regarding Christa's testimony, defense counsel indicated that he was not going to ask to

strike that testimony because Petitioner wanted the jury to assess Christa's credibility and believed that a cautionary instruction from the trial court would not cure any defect. Defense counsel stated that if the preliminary-examination testimony, as well as excerpts from Christa's testimony from Wayne County, where Petitioner was being charged with similar conduct, was all read into the record, then he (defense counsel) would be able to point out and argue certain inconsistencies in her testimony. Petitioner therefore waived defense counsel's ability to argue that the transcripts should not be admitted.

At first, the prosecutor opposed the Wayne-County testimony from being admitted because the attorneys in that proceeding did not have the same motive to cross-examine the witness as in this case. However, defense counsel argued that it should be admitted because Petitioner had a constitutional right of confrontation. Subsequently, the prosecutor agreed.

The trial court then gave defense counsel the opportunity to continue the cross-examination of Christa as opposed to bringing in the transcripts but counsel declined that option.

Subsequently, Christa's preliminary-examination testimony was then read to the jury. The excerpts from the Wayne-County proceeding was read immediately following.

During the preliminary examination, Christa testified that while she was living with Alissa, Petitioner put his private part in her bottom and there was blood on her bottom when she wiped herself. She also testified that Petitioner put his private part in her vagina and into her mouth. According to Christa, when Petitioner put his private part into her mouth, he would push her head down and then she would taste "slimy" stuff in her throat. (Trial Tr. vol. II, p. 111, Mar. 11, 2003.) Christa said that she eventually told her mother what Petitioner had done to her.

Christa's testimony from the Wayne County 35th District Court was also read into the

record.  During that proceeding, Christa said that Petitioner put his private part in her bottom, mouth, and private part.  Christa said that she was six-or-seven-years old the first time that Petitioner assaulted her.

Christine Love, the grandmother of Christa and Christian, and, the mother of Ms. Holinshead, testified next.  According to Ms. Love, when the girls were living in Oak Park, she would pick them up from school, drive them home, and leave them with Petitioner.  She said that when Alissa accused Petitioner of molesting her, she supported Petitioner.  Ms. Love testified that she thought Alissa was lying because of what her daughter had told her.

According to Ms. Love's testimony, on June 16, 2002, when the twins were at her home, along with two of her other grandchildren, Asia and Vincent, Asia came to her and told her that Christa "has a secret but can't tell anyone."  (Trial Tr. vol. II, p. 27, Mar. 11, 2003.)  Ms. Love said that when she then told Christa that she was going to take her home, Christa told her that Petitioner put his penis in her mouth and also in her bottom.  Ms. Love said that Christa told her that when she wiped her bottom she saw blood.  Ms. Love testified that subsequently she took the children to her son's house, so that she could go to her daughter's home to confront her.

Asia Love testified.  She said that Christa and Christian were her cousins.  According to Asia's testimony, when she was at her grandmother's house on June 16, 2002, Christa told her that Petitioner had put his penis in her mouth.  Asia testified that Christa told her that Petitioner threatened her not to tell.  It was Asia's testimony that Christian did not tell her anything.

Petitioner's biological daughter, Alissa, also testified.  She said that she lived with Petitioner, his girlfriend and her twin daughters, in Oak Park starting in November 1998.  According to her testimony, during that time period, when she was fifteen-years-old, Petitioner

asked her if she was a virgin, pulled down her pants, and stuck his finger in her vagina.  Alissa

said that happened about three or four times.  Alissa testified that thereafter Petitioner had sexual

intercourse with her approximately twenty times over several months.  She said that the sexual

act was only vaginal, not oral or anal.  It was Alissa's testimony that she eventually told a friend

what her father had been doing to her.

Laurie Stipes, a registered nurse, who worked in the emergency room at William

Beaumont Hospital in Royal Oak, Michigan, testified that when the twins came in on June 17,

2002, they appeared very withdrawn and had poor eye contact.  According to Ms. Stipes'

testimony, when she questioned Christa, Christa told her that she had been penetrated orally and

anally by her daddy; Christian told her that she had been penetrated orally, anally, and vaginally

by her daddy.

Mary Smyth, M. D., the Medical Director of the Child Advocacy and Protection Team at

William Beaumont Hospital, was qualified to testify as an expert in child abuse, including sexual

assault.  Dr. Smyth testified that she did not examine either child in this case.  However, she did

review the files and records of the examinations conducted by Dr. Mark Thompson on June 17,

2002.  According to Dr. Smyth's testimony, those records showed that there was no trauma to

Christa's labia, vagina, or anus.  She also said that Christian's hymen was intact.

It was Dr. Smyth's testimony that depending on the length of time between the

penetration of a complainant's vagina and anus and a physical examination, those organs could

appear normal to an examiner.  Dr. Smyth said that bleeding would cease within one day and all

other signs of trauma would heal within a couple of days.  According to Dr. Smyth's testimony,

she said that the hymen is not automatically destroyed due to penetration.

The prosecution rested after Dr. Smyth's testimony, and the defense did not present any witnesses or other evidence.

Following the two-day trial, the jury found Petitioner guilty of six counts of first-degree criminal sexual conduct. Subsequently, the trial court sentenced Petitioner to thirty to sixty years imprisonment for each of his six convictions, to be served concurrent to each other.

Petitioner then filed his direct appeal with the Michigan Court of Appeals, raising the following claims:

> I.      Admission of other acts evidence constituted reversible error.
>
> II.     Verdicts of guilty based upon insufficient evidence constitute a denial of due process.
>
> III.    Sentences imposed violate constitutional guarantees against cruel and/or unusual punishment.

The Michigan Court of Appeals denied Petitioner's appeal on June 24, 2004. *People v. Alfonso Mills*, No. 247948, 2004 WL 1416268 (Mich.Ct.App. June 24, 2004) (unpublished). Petitioner subsequently filed an application for leave to appeal with the Michigan Supreme Court, asserting the same claims. The Michigan Supreme Court denied leave on February 28, 2005. *People v. Alfonso Mills*, 472 Mich. 867; 692 N.W.2d 843 (2005). Petitioner did not file a writ of certiorari with the United States Supreme Court.

On May 11, 2006, Petitioner filed a motion for relief from judgment with the trial court, pursuant to M.C.R. 6.500, raising the following claims:

> I.      [Petitioner] was denied due process and a fair trial in

-10-

violation of the Fourteenth and Fifth Amendment[s] to the
United States Constitution by the admission of evidence of
crimes in which he had been acquitted and another which
he was convicted.

II.       [Petitioner] was sentenced to [thirty] years to [sixty] years
incarceration under [MICH.COMP.LAWS §] 769.11 as [a]
habitual felony offender third offense without prior notice
of habitual offender third offense charges.

III.      [Petitioner] was denied the effective assistance of both trial
and appellate counsel in violation of the Sixth Amendment.

The trial court denied Petitioner's motion on October 9, 2006. *People v. Alfonso Mills*,

No. 02-186340-FC (Oakland County Circuit Court, Oct. 9, 2006)  Petitioner subsequently filed

an application for leave to appeal that decision with the Michigan Court of Appeals, which was

denied on June 1, 2007. *People v. Alfonso Mills*, No. 274880 (Mich.Ct.App. June 1, 2007).  His

application for leave to appeal to the Michigan Supreme Court was also denied. *People v.*

*Alfonso Mills*, 480 Mich. 892; 738 N.W.2d 720 (2007).

On August 7, 2007, Petitioner filed his "Petition for Writ of Habeas Corpus" [dkt. #1],

raising the following claims:

I.       Petitioner was denied due process and a fair trial in
violation of the Fourteenth Amendment to the United
States Constitution by the admission of other acts evidence
and evidence of charges of which he had been acquitted.

II.      Petitioner's convictions were based upon insufficient
evidence constituting a denial of due process.

III.      Petitioner was denied the effective assistance of trial
counsel in violation of the Sixth Amendment.

IV.      Petitioner was denied the effective assistance of appellate
counsel in violation of the Sixth Amendment.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), altered the standard of review that federal courts must apply when reviewing a Petition for Writ of Habeas Corpus. The AEDPA standard of review applies to all habeas petitions filed after April 24, 1996, the effective date of the Act. 28 U.S.C. § 2254(d) imposes the following standard:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state[-]court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal-habeas court may

not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."

*Id.* at 410-11.

III.

A.

Petitioner first argues that the trial court erred when it allowed the prosecutor to introduce

other-acts evidence regarding the alleged sexual assault of his biological daughter, Alissa.

Concerning Rule 404(b) evidence, the introduction of the evidence *per se* is a matter of

state law which may not be reviewed by a habeas court.  An issue regarding the admissibility of

evidence or error in state procedure does not rise to a level of constitutional magnitude unless it

can be viewed as so egregious that the petitioner was denied a fundamentally fair trial.  *McAdoo*

*v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 125 S.Ct. 126 (2004).  To determine whether

the admission or inadmissibility of evidence has denied a defendant's fundamental due process

rights, the court should consider the extent to which the evidence is "critical" to the case,

whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive

assurances of trustworthiness."  *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001).

The Sixth Circuit has specifically upheld state convictions against similar habeas

challenges involving Rule 404(b) evidence on the ground that the use of such evidence in those

cases was not fundamentally unfair.  *See Burton v. Renico*, 391 F.3d 764, 773-775 (6th Cir.

2004).  The same conclusion is warranted in this instance.

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case,

stated in pertinent part:

> Defendant now contends on appeal that the trial court
> abused its discretion by admitting this other[-]acts evidence

-13-

concerning defendant's alleged sexual assault of his daughter. Defendant maintains that his daughter's uncorroborated allegations were highly prejudicial given the lack of physical or medical evidence of the assaults in the instant case and the serious questions regarding the complainants' credibility. Defendant also argues that the alleged assaults on his daughter had no probative value because they were not similar to the charged acts; his daughter was fifteen[-]years old at the time of the alleged assaults, whereas the twins were only four[-]years old. Further, the manner of the alleged assaults differed.

We review a trial court's decision to admit other[-]acts evidence for an abuse of discretion. *People v. Sabin (On Remand)*, 463 Mich. 43, 60; 614 NW2d 888 (2000); *People v. Crawford*, 458 Mich. 376, 383; 582 NW2d 785 (1998); *People v. McCray*, 245 Mich.App 631, 634-635; 630 NW2d 633 (2001). An abuse of discretion is found when an unbiased person, reviewing the same facts on which the trial court acted, would conclude there is no justification or excuse for the ruling made. *People v. Hendrickson*, 459 Mich. 229, 235; 586 NW2d 906 (1998). Even if properly preserved, an error in the admission of other[-]acts evidence does not require reversal unless it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v. Knapp*, 244 Mich.App 361, 378-379; 624 NW2d 227 (2001).

Use of other[-]acts evidence reflecting on character is limited by MRE 404(b) to avoid the danger of conviction based on past conduct. *People v. Starr*, 457 Mich. 490, 494-495; 577 NW2d 673 (1998). MRE 404 (b)(1) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such

> other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

To be admissible, the evidence (1) must be offered for a proper purpose under MRE 404 (b); (2) it must be relevant under MRE 402, as enforced through MRE 104 (b); (3) the probative value of the evidence must not be substantially outweighed by the unfair prejudice under the balancing test of MRE 403; and (4) the trial court may provide a limiting instruction if requested. *People v. Knox*, 469 Mich. 502, 509; 674 NW2d 366 (2004), citing *People v. VanderVliet*, 444 Mich. 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich. 1205 (1994). A proper purpose is one other than establishing the defendant's character to show his propensity to commit the offense. *VanderVliet*, supra at 74-75.

In the instant case, the prosecution offered the other[-]acts evidence for a purpose deemed proper under MRE 404 (b): to prove a scheme, plan, or system. Defendant argues the evidence is inadmissible because there were dissimilarities between the other acts (the alleged sexual abuse of his biological daughter) and the assaults against the complainants in this case. We disagree.

In *Sabin*, *supra* at 63, our Supreme Court, focusing on the exception in MRE 404 (b) for evidence showing a "scheme, plan, or system," held that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." The *Sabin* Court cautioned that "[l]ogical relevance is not limited to circumstances in which the charged and uncharged acts are part of a single continuing conception or plot," and that "[g]eneral similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts." *Id.* at 64. There must be such a concurrence of common features so that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design. *Id.* at 64-65. *See also People v. Hine*, 467 Mich. 242, 251; 650 NW2d 659 (2002). Distinctive and unusual features are not required to establish the existence of a common design or plan; the evidence of uncharged acts "needs only to

support the inference that the defendant employed the common plan in committing the charged offense." *Hine*, *supra* at 253, citing *Sabin*, *supra* at 65-66.

Here, defendant had a father-daughter relationship with the MRE 404 (b) witness and the complainants.  *See Sabin*, *supra* at 66.  Defendant was the biological father of the proffered other[-] acts witness, and she lived with him at the time of the assaults.  Although defendant was not the biological father of the complainants, he lived with them, and they called him "daddy" or "dad."  Defendant committed the assaults on the complainants and his daughter during the same time[-]frame, while all were living together in the same house.  Moreover, defendant committed the assaults while his girlfriend, the mother of the complainants, was at work.  He held a position of authority over the complainants and his teenage daughter.  Although his biological daughter was approximately ten years older than the complainants, she did not live with defendant when she was younger, and only started living with him when she was fourteen.  Consequently, defendant did not have the opportunity to commit the abuse on his daughter when she was younger.  The sexual assaults defendant perpetrated on the complainants and his daughter, which included vaginal penetration, occurred on several occasions.  They were not isolated incidents. One could infer from these common features that defendant had a system that involved taking advantage of the parent-child relationship, particularly his control over his daughters, to perpetrate the abuse.  The common features of the charged acts and the other acts support the prosecution's theory that defendant devised a plan or scheme and used it to sexually assault young female relatives in his household.

While we agree with defendant that there were dissimilarities between the acts, i.e., the nature of the sexual acts differed, at most, reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts.  *See Sabin*, *supra* at 67.  A mere difference of opinion on a close evidentiary question will not qualify as an abuse of discretion.  *Sabin*, *supra* at 67; *People v. Smith*, 456 Mich. 543, 550; 581 NW2d 654 (1998).  As in *Sabin*, *supra*, this Court cannot find that the trial court abused its discretion in finding the evidence admissible under a theory of logical relevance.  *Id.* at 68.

We further conclude that the probative value of the other[-] acts evidence was not substantially outweighed by unfair prejudice. *VanderVliet*, *supra*.  Where the complainants' credibility was at issue and under attack, the evidence served to rebut defendant's claims of fabrication and explained the

complainants' delay in reporting the sexual assaults. *See Starr, supra* at 503. Moreover, the trial court gave a limiting instruction to the jury, cautioning that the other[-]acts evidence could only be considered for a limited purpose, not to show that defendant was a bad person, thereby lessening any prejudicial effect of the evidence. It is well[-] established that jurors are presumed to follow their jury instructions. *People v. Graves*, 458 Mich. 476, 486; 581 NW2d 229 (1998). Based on the evidence of record, we cannot conclude that the trial court's decision to admit the other[-]acts evidence was an abuse of discretion. *Crawford, supra.*

*Mills*, No. 247948, 2004 WL 1416268, slip op. at 2-3 (Footnotes omitted).

The Michigan Court of Appeals, in reviewing Petitioner's claim, held that the incidents were not isolated incidents. Rather, the state-appellate court found that one could infer from the common features that Petitioner had a system which involved taking advantage of the parent-child relationship, thus supporting the prosecution's theory that he had devised a plan or scheme and used it to sexually assault young-female relatives in his household. The Court of Appeals also found that the probative value of the evidence was not substantially outweighed by its prejudicial effect.

On the basis of the above, this Court finds that the Michigan Court of Appeals' holding as to the introduction of the 404(b) evidence was not contrary to, or an unreasonable application of, clearly established federal law so as to entitle Petitioner to habeas relief. Petitioner has not shown that the admission of the disputed evidence rendered his trial fundamentally unfair. As such, Petitioner is not entitled to habeas relief on this claim.

B.

Petitioner next contends that he is entitled to a writ of habeas corpus because the evidence

-17-

presented at trial was insufficient to support his six counts of first-degree-criminal-sexual conduct convictions. Petitioner claims there was insufficient evidence because the two child victims were not credible; one child was found incompetent to testify and contradicted her prior testimonies, and the other child's testimony was also questionable. Petitioner also argues that there were no other eyewitnesses to the sexual assaults, and that there was no physical evidence to support the allegations of penetration.

A claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254. Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-29 (2001), "a state-law question regarding the elements of the crime predicates the enforcement of [Petitioner's] federal constitutional right." *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

Sufficient evidence supports a conviction if, after viewing the evidence (and all inferences to be drawn therefrom) in a light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1148 (2004). This standard of review obviously does not permit the federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts

in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie*, 326 F.3d at 727.

This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense; however, if the state has made the absence of a defense an element of the crime, sufficiency of evidence on the issue will then be relevant. *Allen v. Redman*, 858 F.2d 1194, 1196-98 (6th Cir. 1988). Circumstantial evidence may support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *Clifford v. Chandler*, 333 F.3d 724, 728 (6th Cir. 2003), *cert. denied*, 124 S.Ct. 1601 (2004).

Regarding Petitioner's insufficient evidence claim, the last state court, the Michigan Court of Appeals, which issued a reasoned opinion rejecting this claim, stated in pertinent part:

> This Court reviews claims regarding the sufficiency of the evidence de novo. *People v. Lueth*, 253 Mich.App 670, 680; 660 NW2d 322 (2002). We view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found all the elements of the crime proven beyond a reasonable doubt. *People v. Nowack*, 462 Mich. 392, 399-400; 614 NW2d 78 (2000). Circumstantial evidence and reasonable inferences that arise from the evidence can constitute sufficient proof of the elements of the crime. *Id.* "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id.* at 400. The prosecution need not negate every reasonable theory consistent with innocence; instead, "it need only convince the jury 'in the face of whatever contradictory evidence the defendant may provide.'" *Id.*, quoting *People v. Konrad*, 449 Mich. 263, 273 n 6; 536 NW2d 517 (1995). This Court will not interfere with the jury's role in determining the weight of evidence or credibility of the witnesses. *People v. Wolfe*, 440 Mich. 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992); *People v. Avant*, 235 Mich.App 499, 506; 597 NW2d 864 (1999).
>
> The elements of first-degree criminal sexual conduct are that a defendant engaged in sexual penetration with another, and that the other was under thirteen years of age. MCL 750.20b(1)(a); *People v. Hammons*, 210 Mich.App 554, 57; 534 NW2d 183 (1995).

In this case, defendant contends that the evidence was insufficient, particularly in light of the fact that the trial court found one of the twins to be incompetent to testify. However, due to tactical decisions by defense counsel, this victim's testimony was not stricken. Defense counsel was thus able to impeach her trial testimony with her former testimony at the preliminary examination and at the district court proceedings in Wayne County. Although there were some inconsistencies in the victim's testimony, the main focus of her testimony was clear-defendant sexually abused her on several occasions while his girlfriend was at work. The victim testified in detail that went well beyond her years that defendant put his private part in her bottom, mouth, and vagina.

The second victim testified that, under similar circumstances and during the pertinent time period, defendant put his private part in the area where she urinates, more than ten times. She further testified in graphic detail that defendant also put his penis in her mouth and in her bottom. While the twins were living in Oak Park, they both complained to their mother that their bottoms hurt. Although there was no physical evidence of abuse, the examining physician testified that this was not unusual. Both victims told the emergency room nurse about the abuse. In June 2002, the victims disclosed to their grandmother that defendant had sexually assaulted them and had threatened them in order to maintain their silence.

The testimony of a victim is sufficient evidence from which a trier of fact can infer that a sexual penetration occurred. MCL 750.520h; *People v. Robideau*, 94 Mich.App 663, 674; 289 NW2d 846 (1980), *aff'd on other grounds*, 419 Mich. 458 (1984). Moreover, as previously noted, the issue of the credibility of the complainant's testimony is for the trier of fact, and we will not resolve credibility issues anew on appeal. *People v. Milstead*, 250 Mich.App 391, 404; 648 NW2d 648 (2002). Here, viewing the above evidence in a light most favorable to the prosecution, we conclude the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that defendant engaged in multiple acts of oral, anal, and vaginal sexual penetration with his four-year-old twin daughters, so as to sustain his convictions on six counts of first-degree criminal sexual conduct.

*Mills*, No. 247948, 2004 WL 1416268 slip op. at 4-5 (Footnotes omitted).

This Court finds that Petitioner has failed to show that the state-court's decision was contrary to or an unreasonable application of Supreme Court precedent. As stated above by the Michigan Court of Appeals, under Michigan law, the elements of first-degree criminal sexual conduct are that (1) a defendant engaged in sexual penetration with another, and, (2) the other was under thirteen years of age. *Hammons*, 210 Mich.App. at 57. Petitioner argues that because the trial court found one of the twins to be incompetent to testify, the evidence was insufficient.

In addressing Petitioner's claim, the Michigan Court of Appeals considered the following facts: Christa's preliminary-examination testimony and her Wayne-County testimony and Christian's testimony. The Michigan Court of Appeals held that, based on the foregoing facts, a rational trier of fact could have found beyond a reasonable doubt that Petitioner "engaged in multiple acts of oral, anal, and vaginal sexual penetration with his four-year-old twin [], so as to sustain his convictions on six counts of first-degree criminal sexual conduct." *Mills*, No. 247948, 2004 WL 1416268, slip op. at 5. That determination was itself correct and a reasonable application of *Jackson*, *supra*. Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

C.

Petitioner next alleges that trial counsel was ineffective for failing to (1) adequately prepare and argue against admission of prior instances of sexual abuse, and, (2) become familiar with the relevant facts of the prior sexual abuse so as to effectively argue against its admission.

Petitioner raised this claim for the first time in his post-conviction motion for relief from judgment, which the trial court and the state-appellate courts denied for failing to establish entitlement to relief under M.C.R. 6.508(D). Because this claim was not raised before, it is therefore procedurally defaulted. However, Petitioner contends that because appellate counsel was ineffective for failing to raise his defaulted ineffective-assistance-of-trial-counsel claim, he is therefore able to establish cause and prejudice to excuse the default. Petitioner also argues that a fundamental miscarriage of justice would occur if this Court fails to review his claim. The Court disagrees.

Federal habeas review is barred where a state court declined to address a prisoner's federal claims because the prisoner failed to meet state-procedural requirements. In such cases, the state-court judgment rests on independent and adequate state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991).

For a claim to be procedurally defaulted on the basis of a state-procedural rule, the petitioner must have violated a procedural rule and the state court must have also based its decision on the procedural default. *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000). If a state prisoner defaults his federal claims in state court in a decision based on an independent and adequate state-procedural rule, those claims cannot be viewed in a habeas proceeding. *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). In order for the procedural-default doctrine to apply, the last state court rendering a judgment in the case must have based its judgment on the procedural default. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Here, the Michigan Court of Appeals and Michigan Supreme Court, the last state courts rendering judgments on this issue, based their decisions to deny Petitioner's applications for

leave to appeal the trial court's denial of his motion for relief from judgment on Petitioner's failure to comply with M.C.R. 6.508(D).  *People v. Alfonso Mills*, No. 274880 (Mich.Ct.App. June 1, 2007); *People v. Alfonso Mills*, 480 Mich. 892; 738 N.W.2d 720 (2007).  Since the Michigan Court of Appeals and the Michigan Supreme Court were the last state courts rendering judgments in this case, their decisions denying Petitioner's claims on the basis of a state-procedural bar prevents federal habeas review.  *Simpson*, 238 F.3d at 407.

A federal-habeas petitioner who fails to comply with a state's procedural rules waives his right to federal-habeas review absent a showing of cause for noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation or some showing of a fundamental miscarriage of justice.  Petitioner attempts to establish cause to excuse his procedural default by claiming that his appellate counsel was ineffective for failing to raise this claim in his direct appeal.  Attorney error will not constitute adequate cause to excuse a procedural default unless it amounts to constitutionally ineffective assistance of counsel under the criteria established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The mere failure to raise a claim, even if it is meritorious on appeal, does not constitute ineffective assistance of appellate counsel sufficient to establish cause to excuse a procedural default.  *Rust v. Zent*, 17 F.3d 155 (6th Cir. 1994).  The United States Supreme Court, in *Smith v. Robbins*, 520 U.S. 259 (2000), stated, among other things:

> In *Jones v. Barnes*, 463 U.S. 745 (1983) [parallel citations omitted], we held that appellate counsel who filed a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.  Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.  See, e.g., *Gray v. Greer*, 800 F.2d 644,

646 (C.A. 7 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").

*Smith v. Robbins*, 520 U.S. at 288; *See also McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000) (where claim was not "dead bang winner," the petitioner's appellate counsel's failure to raise it on direct appeal did not constitute cause to excuse procedural default).

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

In this case, the record reveals that appellate counsel raised various issues in Petitioner's direct appeal but that Petitioner's convictions were affirmed. Therefore, the Court finds that Petitioner failed to demonstrate that the issues that were allegedly ignored by his appellate counsel in his direct appeal were clearly stronger than those that were presented, and he has thus failed to overcome the strong presumption that his counsel was competent.

Since Petitioner has failed to establish cause for his procedural default, there is no need to determine whether Petitioner can meet the prejudice prong of the "cause and prejudice" test. *Smith v. Murray*, 477 U.S. 527 (1986); *Long v. McKeen*, 722 F.2d 286 (6th Cir. 1983). Because Petitioner has failed to meet his burden of establishing cause and prejudice for his procedural default, and because he has failed to establish a showing of fundamental miscarriage of justice, the claim is not cognizable under federal habeas review. Therefore, Petitioner is not entitled to habeas relief on these remaining claims.

Against that backdrop, this Court finds that the Michigan Court of Appeals' decision was reasonable and supported by the record. The state-court adjudications of Petitioner's claims were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on his ineffective-assistance-of-counsel claims.                                        IV.

Accordingly, the Court **DENIES WITH PREJUDICE** Petitioner's "Petitioner for Writ of Habeas Corpus" [dkt. # 1].

**IT IS SO ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 4, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record and Alfonso Mills by electronic means or U.S. Mail on September 4, 2008.

s/Carol A. Pinegar
Deputy Clerk